504 A.2d 168

**COMMONWEALTH of Pennsylvania, Appellant,**

**v.**

**David E. HUBBLE, Appellee.**

Supreme Court of Pennsylvania.

Argued Dec. 7, 1984.

Decided Jan. 16, 1986.

498

Brett O. Feese, Dist. Atty., Kenneth A. Osokow, Asst. Dist. Atty., Lycoming Co., for appellant.

Robert B. Elion, Lycoming Co., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDER-MOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION ANNOUNCING THE JUDGMENT
## OF THE COURT

LARSEN *, Justice.

We granted the Commonwealth's petition for allowance of appeal in this case to determine whether the Superior Court, 318 Pa.Super. 76, 464 A.2d 1236 (1983), erred in awarding appellee a new trial on the grounds that his confession should have been suppressed under the principle enunciated by the United States Supreme Court in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), *reh'g*. denied 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981). A majority of this Court agrees that *Edwards* does not require suppression of appellee's confession and we therefore reverse the Superior Court.

On August 5, 1976, the bodies of Mrs. Claire Kepner and her two young children were discovered in their home near Muncy in Lycoming County. All had been shot with a .32 caliber gun, and one of the children had been slashed with a knife.[1] These three homicides engendered an intensive investigation by the Pennsylvania State Police which culminated with the arrests of David Hubble, appellee, as well as his brother, Robert K. Hubble, and Milton Scarborough in the summer of 1977.

Appellee was first interviewed by state troopers regarding the homicides in April of 1977 and then on several occasions in July. The events underlying the suppression matters occurred principally on July 12th and 13th, and, briefly, took place as follows. On July 12, 1977, appellee and his wife voluntarily accompanied Troopers John S. Shimko and Chester J. Zaremba to the State Police Bar-

---

* This case was reassigned to this author on September 15, 1985.

1. The macabre happenings of this multiple homicide are set forth more fully in *Commonwealth v. Robert Kelsey Hubble*, 314 Pa.Super. 99, 460 A.2d 784 (1983) and *Commonwealth v. Scarborough*, 313 Pa.Super. 521, 460 A.2d 310 (1983) and need not be repeated herein. In these cases, the convictions of appellee's co-defendants, who were separately tried, were affirmed by the Superior Court. This Court denied co-defendants' petitions for allowance of appeal on October 12, 1983.

racks in Montoursville. At approximately 2:15 p.m., appellee gave a taped statement to the troopers which was not self-incriminating; this statement reiterated what appellee had previously informed the troopers regarding his brother's involvement in the homicides. Subsequently, in the process of leaving the barracks to be returned to their home, appellee and his wife indicated that they wished to speak with each other and were given an opportunity to do so. At approximately 5:45 p.m. appellee gave a second taped statement to the police, this time inculpating himself in the homicides. Appellee and his wife were then returned to their home.

The following day, appellee telephoned Trooper Shimko and informed him that everything he had told Shimko the previous day was a lie. However, upon voluntarily returning to the barracks with his wife on July 13th, appellee admitted that his July 12th confession had been truthful and he essentially reiterated that confession. Prior to each statement, and on several occasions previous to July 12th, appellee had been advised of his *Miranda* rights [2] and had signed a written waiver of those rights.

Appellee moved to suppress these statements of July 12–13, 1977 and a lengthy pretrial suppression hearing was conducted on November 11, 1977 before the Honorable John A. Walter in the Court of Common Pleas of Lebanon County.[3] The court denied appellee's motion to suppress and the case was tried before a jury. On November 25, 1977, the jury found appellee guilty of robbery, burglary, theft, conspiracy and three counts of murder of the second degree. Appellee filed post-verdict motions which were denied by the court *en banc.* In his opinion for the court *en banc,* Judge Walter stated:

> Defendant first contends that the Court erred in failing to grant his motion to suppress incriminating statements

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**3.** Because of pervasive pretrial publicity in this case and that of appellee's co-defendants, this Court ordered a change of venue on October 13, 1977.

taken from him by the police. Specifically, defendant alleges that on July 12, 1977, he was subject to custodial interrogation calculated to evoke admissions without being adequately informed of his right to counsel and in the absence of an intelligent, informed waiver of such right.

. a.

We must first determine whether or not defendant was subject to custodial interrogation on July 12, 1977. The test for determining whether a person is in custody for *Miranda* purposes is whether he "... is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation...." *Commonwealth v. Romberger*, 454 Pa. 279, 283, 312 A.2d 353, 355 (1973). (footnote omitted) Slip opinion of court *en banc* at 1–2.

Because appellee had been subjected to a polygraph examination and to intermittent questioning over an eight hour period by Pennsylvania State Police officers at the police barracks on July 12, 1977, the court *en banc* concluded that appellee had been in custody. That court cited and discussed *Commonwealth v. Brown*, 473 Pa. 562, 375 A.2d 1260 (1977) to support its view that a reasonable person in appellee's situation would have "perceived the restraint of his freedom." *Id.*

Having determined that appellee had been in custody, the court then examined the nature of the questions and statements posed to him by various state troopers, determined that appellee had been "subject to police conduct calculated to or likely to evoke admissions," and held that appellee had been subject to interrogation. *Id.* at 3–5, *citing Commonwealth v. Simala*, 434 Pa. 291, 252 A.2d 575 (1969) *and Commonwealth v. Yount*, 455 Pa. 303, 314 A.2d 242 (1974). Thus the court held that appellee had been subjected to "custodial interrogation" for *Miranda* purposes.

The court further found that appellee had been adequately advised of his *Miranda* rights, that he knowingly, volun-

tarily and intelligently waived his right to remain silent and to have counsel present during questioning, and that, considering the "totality of the circumstances," his confession was the "product of a 'free and unconstrained choice.' " *Id.* at 5–9. Accordingly, the court *en banc* affirmed the denial of appellee's motion to suppress, and denied the remaining post-verdict motions as well. Appellee appealed that denial to the Superior Court, which reversed and remanded for a new trial.

Initially, the Superior Court identified the appropriate standards of appellate review of a suppression court's rulings:

On review, our responsibility is 'to determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings.' *Commonwealth v. Goodwin,* 460 Pa. 516, 521, 333 A.2d 892, 895 (1975).

"If the suppression court has determined that the evidence is admissible, 'this Court will consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted.' *Commonwealth v. Kichline,* 468 Pa. 264, 280, 361 A.2d 282, 290 (1976); see *Culombe v. Connecticut,* 367 U.S. 568, 604, 81 S.Ct. 1860, 1878, 6 L.Ed.2d 1037 (1961) (Opinion of Frankfurter, J.)" *Commonwealth v. Brown,* 473 Pa. 562, 566, 375 A.2d 1260, 1262 (1977).

318 Pa.Superior Ct. at 78, 464 A.2d at 1237. After examining the record pertaining to the events of July 12, 1977, the Superior Court affirmed the lower court's finding of custodial interrogation, stating:

The suppression court held that [appellee] had been subjected to custodial interrogation on July 12, 1977 for *Miranda* purposes and that the investigating officers had engaged in interrogation and conduct calculated to or likely to evoke admissions. We agree with these legal conclusions. They are based upon the court's findings of fact and are amply supported by the record. See: *Com-*

monwealth v. Chacko, 500 Pa. 571, 578–82, 459 A.2d 311, 314–316 (1983) (numerous further citations omitted). The suppression court determined further that [appellee] had been adequately advised of his right to appointive counsel and that he had voluntarily and knowingly waived his right to such counsel. "We are bound by the court's findings of fact where, as here, they are supported by the record."

Id., 318 Pa.Superior Ct. at 83–4, 464 A.2d at 1240. (citations omitted).[4]

Nevertheless, the Superior Court reversed and awarded appellee a new trial based upon its understanding that appellee's waiver of his right to counsel was ineffective *as a matter of law* under Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), *reh'g denied* 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981), and that, therefore, his confession should have been suppressed. This holding is wrong.

In Edwards, the United States Supreme Court held that: when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interroga-

---

**4.** The Commonwealth vigorously argues that we should reverse the determination of the Superior Court, affirming that of the suppression court, that appellee had been in custody when he rendered the challenged statements of July 12, 1977. The Commonwealth states: "No formal arrest occurred nor was there any restraint on [appellee's] freedom associated with a formal arrest. No coercive atmosphere was present and a reasonable person *could not have concluded that* his freedom of action was being restricted." Brief for appellant at 35. The argument is predicated primarily on the fact that appellee and his wife voluntarily went with police to the barracks, knew they were free to leave at any time (according to the troopers' testimony), and in fact were in the process of being taken home at one point when they decided to stay and, eventually, confess.

While this argument is not without merit it emphasizes the factors on the "non-custodial" side of the ledger to the exclusion of the factors on the "custodial" side. While this Court perhaps might have reached a different conclusion based on these factors, the suppression court's conclusion that appellee had been in custody is supported by record evidence, and the Superior Court, therefore, properly affirmed.

tion even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

.... We ... emphasize that it is inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel.

451 U.S. at 484–85, 101 S.Ct. at 1884–85 (footnote omitted).

In reliance upon *Edwards,* the Superior Court held, in the instant case:

The record in this case establishes beyond peradventure of a doubt that after appellant had clearly and unequivocally invoked his right to counsel and after he had attempted, unsuccessfully, to reach counsel by telephone, he was questioned further by Trooper Shimko. That he responded to such police-initiated questioning does not establish a waiver of the right to counsel previously invoked. "For a waiver ... to be effective, the reversal of the defendant's position *must* have been initiated by him." (citation omitted) Here, it was not appellant who, after asserting his rights, indicated a desire to waive them without further activity on the part of the police. Instead, it was the police who initiated the chain of events which culminated in appellant's inculpatory statement. This was improper. Appellant had requested and was entitled to have counsel present. His statement given in response to police questioning and without counsel should have been suppressed.

318 Pa.Superior Ct. at 89, 464 A.2d at 1242–43.

The Superior Court's reliance on *Edwards* to suppress appellee's statement is misplaced because, despite that court's strong language to the contrary, the record does *not* establish that appellee "clearly and unequivocally invoked his right to counsel" so as to trigger *Edwards'* prophylactic

prohibition against all further police-initiated conversation.[5] As the United States Supreme Court recently stated:

This "rigid" prophylactic rule [enunciated in *Edwards v. Arizona*] embodies two distinct inquiries. *First, courts must determine whether the accused actually invoked his right to counsel. See, e.g., Edwards v. Arizona, supra,* 451 U.S., at 484–485, 101 S.Ct., at 1884–1885.... Second, *if the accused invoked his right to counsel,* courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked. *Edwards v. Arizona, supra,* 451 U.S., at 485, 486, n. 9, 101 S.Ct., at 1885, n. 9.

*This case concerns the threshold inquiry: whether Smith invoked his right to counsel in the first instance. On occasion an accused's asserted request for counsel may be ambiguous or equivocal.* As the majority and dissenting opinions below noted, courts have developed conflicting standards for determining the consequences of such ambiguities. (citations and footnote omitted). We need not resolve this conflict in the instant case, however, because the judgment of the Illinois Supreme Court must be reversed irrespective of which standard is applied.

The conflict among courts is addressed to the relevance of alleged ambiguities or equivocations that either (1) *precede* an accused's purported request for counsel, or (2) are part of the request *itself.* Neither circumstance pertains here, however.

*Smith v. Illinois,* 469 U.S. at ——, 105 S.Ct. at 492–93.

Because the Illinois Supreme Court had inferred ambiguity into Smith's otherwise unequivocal request for counsel from his responses to *subsequent* police questioning, the

---

**5.** The United States Supreme Court has recently determined that its decision in *Edwards v. Arizona* is to be retroactively applied to cases that were on direct appeal in the state courts at the time of that decision on May 18, 1981. *Shea v. Louisiana,* 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985). *But cf. Solem v. Stumes,* 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984) (*Edwards* is not to be applied retroactively to cases pending collateral review after conviction is made final following affirmance on direct appeal).

United States Supreme Court reversed, holding that "[w]here nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease." *Id.* at —, 105 S.Ct. at 494.

■ As in *Smith*, the instant case concerns the threshold inquiry, i.e. *whether* appellee had invoked his right to counsel. Unlike *Smith*, however, the nature of appellee's "request for counsel" and the circumstances preceding such "request" were indeed equivocal and demonstrate that, in fact, appellee did *not* invoke his right to counsel. We do not, therefore, cross the *Edwards* threshold.

Prior to July 12, 1977, the date on which appellee's challenged confession was rendered, appellee had been interviewed by state troopers on several occasions, and on each occasion expressly waived his *Miranda* rights, including his right to counsel. Appellee had also been previously acquainted with his *Miranda* rights due to three prior arrests and convictions following guilty plea proceedings which included full colloquies at which appellee indicated that he knew and understood his rights. On July 12th, appellee was again given *Miranda* warnings several times and again signed written waiver forms and demonstrated a willingness to talk freely. For most of the day and at all important times that day, appellee was accompanied and advised by his wife, Virginia Hubble.

At approximately 2:00 p.m., according to the testimony of Trooper Shimko, the following occurred. Trooper Shimko asked appellee if he would be willing to give a tape-recorded statement, at which point Virginia Hubble suggested to appellee, "I think you better get a lawyer." Appellee then stated, "I want a lawyer," followed by, "I want a public defender." At that point, Trooper Shimko responded:

Dave, *you can call whoever you want to call.* I do not believe that a public defender will come out to talk to you because you were not arrested. We are not accusing you of any crime. We're talking about what Bob had told you. This is all we're concerned with at this particular

time, *but you are willing or you're able to call whoever you wish to call.*

Notes of Testimony, Suppression Hearing, November 11, 1977 at 114a; *see also* N.T. at 177a (on cross-examination).

Although the trooper's statement regarding the availability of the public defender was erroneous and potentially misleading, the clear import of his response was that appellee could contact the public defender if he wished. Appellee's wife testified that she was aware, despite the trooper's comments, that her husband had a right to have counsel present. N.T. at 273a–74a. It is also apparent that appellee was not misled, because he next told Trooper Shimko that he wanted to call Mr. Jack Felix, a former public defender who had represented him in his previous difficulties with the law. The trooper looked up Mr. Felix's telephone number and appellee called this attorney's office but was informed he was not available.

Appellee then stated his desire to call his probation officer, Mr. Dave McCool, which he did. Appellee reached Mr. McCool at his residence. McCool testified that he told appellee he did not know if a public defender would come out to the police barracks, but he encouraged appellee to call the public defender's office. N.T. at 251a. Despite being advised to do so by both Trooper Shimko and Mr. McCool, and having every opportunity to do so, appellee did not contact the public defender's office nor did he make or request to make any further telephone calls.

Trooper Shimko again asked appellee if he would give a taped statement, which appellee agreed to do. This taped statement did not inculpate appellee. After that statement was given, Trooper Shimko advised appellee and Mrs. Hubble that he would take them home. According to Trooper Shimko and Mrs. Hubble, they and appellee walked down the hallway with their coats on and were about to leave the barracks when *appellee stated* that he wanted to first speak with his wife. N.T. at 122a–123a. Appellee and Mrs. Hubble were then left alone to talk. Several times, Trooper Shimko stopped in and asked, "What are you going to do

here? Do you want to go home? Do you want to talk?"
N.T. at 123a.

After about forty-five minutes, Trooper Shimko and an-
other officer told appellee and his wife that they had
information placing appellee at the scene of the crime.
Appellee's wife then gave the officers an account of events
that corresponded to that information. Appellee again con-
ferred privately with his wife for approximately one-half
hour until Trooper Shimko asked appellee whether he had
participated in the crime. At that point, appellee gave the
taped confession which the Superior Court held must be
suppressed under *Edwards.*

Under all of these circumstances which appear of record,
appellee did not invoke his right to counsel. What appellee
*did* request was to call a particular attorney, which he did
with Trooper Shimko's assistance, and to call his probation
officer, which he did. While he had full opportunity to do
so, appellee did not heed the advice given him to contact the
public defender's office. Moreover, appellee initiated the
events which lead to his inculpatory statement, since the
prior interview had ended and appellee and Mrs. Hubble
were in the process of leaving the barracks *when appellee
requested to stay* and talk with his wife privately. These
circumstances leading up to and surrounding appellee's
requests to call "a lawyer", then Mr. Felix and Mr. McCool
do not present the situation or the type of police conduct
condemned in *Edwards v. Arizona.*

The United States Supreme Court stated in *Smith v.
Illinois, supra:*

Our decision is a narrow one. We do not decide the
circumstances in which an accused's request for counsel
may be characterized as ambiguous or equivocal as a
result of events preceding the request or of nuances
inherent in the request itself, nor do we decide the
consequences of such ambiguity or equivocation. We
hold only that, under the clear logical force of settled
precedent, an accused's *post-request* responses to further
interrogation may not be used to cast retrospective doubt

on the clarity of the initial request itself. Such subsequent statements are relevant only to the distinct question of waiver.

105 S.Ct. at 495. Although the Court did not decide the issue, it recognized at least three approaches to the problem of the consequences of ambiguity/equivocation in an accused's "request for counsel" taken by various jurisdictions:

Some courts have held that all questioning must cease upon any request for or reference to counsel, however equivocal or ambiguous. *See e.g. People v. Superior Court*, 15 Cal.3d 729, 735–736, 125 Cal.Rptr. 798, 802–803, 542 P.2d 1390, 1394–1395 (1975), cert. denied, 429 U.S. 816, 97 S.Ct. 58, 50 L.Ed.2d 76 (1976); *Ochoa v. State*, 573 S.W.2d 796, 800–801 (Tex.Crim.App.1978) Others have attempted to define a *threshold standard of clarity for such requests, and have held that requests falling below this threshold do not trigger the right to counsel. See, e.g. People v. Krueger*, 82 Ill.2d 305, 311, 45 Ill.Dec. 186, 189, 412 N.E.2d 537, 540 (1980) ("[A]n assertion of the right to counsel need not be explicit, unequivocal, or made with unmistakable clarity," *but not "every reference to an attorney no matter how vague, indecisive or ambiguous should constitute an invocation of the right to counsel"*), cert. denied 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 390 (1981). Still others have adopted a third approach, holding that *when an accused makes an equivocal statement that "arguably" can be construed as a request for counsel, all interrogation must immediately cease except for narrow questions designed to "clarify" the earlier statement and the accused's desires respecting counsel. See, e.g., Thompson v. Wainwright*, 601 F.2d 768, 771–772 (CA5 1979); *State v. Moulds*, 105 Idaho 880, 888, 673 P.2d 1074, 1082 (App.1983).

105 S.Ct. at 493, n. 3 (emphasis added).

The first approach (all questioning must cease upon any mention of counsel no matter how ambiguous or equivocal) is unduly restrictive. As the United States Supreme Court recently stated in the context of analyzing the consequences

of a procedural *Miranda* violation, "[f]ar from establishing a rigid rule, we direct courts to avoid one...." *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222, 238 (1985). This directive is sage advice in deciding the circumstances in which an accused's requests "for counsel" may be characterized as ambiguous or equivocal, and in determining the consequences of such characterization. To hold that every utterance of the word "lawyer" automatically erects the *Edwards'* "cone of silence" around the accused, thus insulating him from *all* further police-initiated questioning and communication, would be far too rigid and would not serve the interests or needs of justice.

Under either of the other two approaches recognized by the United States Supreme Court, appellee's confession need not be suppressed. Appellee initially requested "a lawyer" or "a public defender," but then, after being advised that he could contact the public defender, requested to contact a particular attorney, and then his probation officer. With the possible exception of the erroneous statement about the public defender, which did not in fact mislead either appellee or his wife regarding appellee's right to counsel, Trooper Shimko scrupulously honored appellee's requests and assisted appellee in placing his telephone calls. Appellee did not attempt to contact the public defender's office though advised and given the opportunity to do so. Neither appellee nor his wife subsequently expressed the desire to speak with an attorney. From the foregoing, I would hold that appellee's requests did not pass the threshold level of clarity that trigger the *Edwards* prophylactic rule and that the subsequent conduct of the police officers following appellee's equivocal requests demonstrates a good faith, reasonable effort to comply with appellee's desires and to honor his right to counsel.

Moreover, were we to agree with the Superior Court that appellee's ambiguous request invoked his right to counsel in a manner clear enough to trigger *Edwards,* suppression of appellee's confessions would still be unwarranted because, under the circumstances, appellee (1) initi-

ated "further communication, exchanges, or conversations with the police", and (2) knowingly and intelligently waived the right to counsel. *Edwards v. Arizona, supra,* 451 U.S. at 485, 486 n. 9, 101 S.Ct. at 1885 n. 9.

In *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), the defendant had stated during custodial interrogation, "I do want an attorney before it goes very much further." The interrogation then ceased. Subsequently, while being transported to another jail, the defendant asked "Well, what is going to happen to me now?" The police officer responded that the defendant need not talk to him since defendant had requested an attorney, but then suggested that defendant take a polygraph examination. The next day, the defendant was readvised of his *Miranda* rights, waived them, and took the polygraph. After being told that he did not seem to be telling the truth, the defendant confessed. *Id.* at 103 S.Ct. 2833.

The Oregon Court of Appeals reversed defendant's conviction "holding that [the] inquiry he made of a police officer at the time he was in custody did not 'initiate' a conversation with the officer, and that therefore statements by the [defendant] growing out of that conversation should have been excluded from evidence under *Edwards v. Arizona." Id.* at 103 S.Ct. 2832. A majority of the United States Supreme Court reversed the Oregon court and held that *Edwards* did not require suppression of the confession. Justice Rehnquist wrote the plurality opinion (joined by the Chief Justice, Justice White and Justice O'Connor; Justice Powell agreed that *Edwards* did not require suppression of the confession and filed a concurring opinion) in which he held that *Edwards* had been misapplied because the defendant had indeed initiated further "communication, exchanges, or conversations with the police," stating:

There can be no doubt in this case that in asking, "Well, what is going to happen to me now?", respondent "initiated" further conversation in the ordinary dictionary sense of that word. . . .

Although ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship. ... On these facts we believe that there was not a violation of the *Edwards* rule.

Since there was no violation of the *Edwards* rule in this case, the next inquiry was "whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Edwards v. Arizona,* 451 U.S., at 486, n. 9, 101 S.Ct., at 1885, n. 9. As we have said many times before, this determination depends "upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Id.* at 103 S.Ct. 2835 (citations omitted). Justice Rehnquist further stated that the "initiation of further conversation" requirement of *Edwards* was "designed to protect an accused in police custody from being badgered by police officers in the manner in which the defendant in *Edwards* was." *Id.* at 103 S.Ct. 2834. Justice Powell agreed that the defendant's confession should not have been suppressed under *Edwards,* but filed a concurring opinion because he would not apply the majority's two-step analysis in waiver of right to counsel cases. Justice Powell would simply apply the *Zerbst*-waiver standard (*Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)) to determine whether a defendant's waiver of his right to counsel was knowing and intelligent, and would consider the fact of initiation of subsequent conversation as one of the *factors* to be considered. 103 S.Ct. at 2836–38. Justice Powell found that the defendant had made a valid waiver of his right to counsel. *Id.*

Applying *Oregon v. Bradshaw* to the instant case, it is apparent that *Edwards* does not require suppression of appellees' confessions. As set forth more fully above, appellee initiated the events which culminated in his confessions. Slip opinion at 12–13. Rather than return home, appellee asked to speak in private with his wife at the police barracks which he did at length, despite being asked several times whether he wanted to go home or talk. Under the circumstances, appellee was hardly "badgered by police officers in the manner in which the defendant in *Edwards* was"; instead, appellee "initiate[d] further communication, exchanges, or conversations with the police." *Oregon v. Bradshaw, supra* at 103 S.Ct. 2834.

■ Since appellee initiated further communication, we must examine the totality of the circumstances to determine whether there was a knowing, intelligent and voluntary waiver of his right to remain silent and his right to counsel. *Id.* at 2835, 2838; *Johnson v. Zerbst, supra.* In examining the totality of the circumstances surrounding a confession, this Court has looked to a myriad of factors including the duration and methods of interrogation, the conditions of detention, the manifest attitude of the police toward the accused, the accused's physical and psychological state, and "all other conditions present which may serve to drain one's powers of resistance to suggestion and undermine his self-determination." *Commonwealth v. Crosby,* 464 Pa. 337, 346 A.2d 768 (1975). Regarding the validity of a waiver of the right to counsel, once a suspect has ambiguously requested to contact an attorney, a factor is, of course, whether the suspect or the police have initiated subsequent conversation leading to the incriminating statement. *Commonwealth v. Youngblood,* 453 Pa. 225, 307 A.2d 922 (1973); *Commonwealth v. Scarborough,* 491 Pa. 300, 421 A.2d 147 (1980). However, this is only one factor, albeit an important one, in the evaluation of whether the right to counsel was knowingly, intelligently and voluntarily waived. *Id.*

Based on the totality of the circumstances, we affirm, as did the Superior Court, the lower court's findings and conclusion that appellee knowingly, voluntarily and intelligently waived his right to counsel.

 Finally, we note that, even if we considered appellee's first statement on July 12, 1977 to be inadmissible under *Edwards*, the introduction of that non-inculpatory statement against him at trial was harmless error and his other challenged statements of July 12th and 13th would nevertheless remain admissible. The first statement was not inculpatory and merely reiterated information that appellee had previously given the state troopers. Following that statement, the troopers *ended* the interview and began to take appellee and his wife home. Appellee thereafter initiated the subsequent events which lead to his second statement of July 12th and his third statement of July 13th—his inculpatory confessions.

The taint of any "illegality" associated with the first statement is thoroughly dissipated by this break in the casual connection between the first and the second and third statements, demonstrating that appellee's confessions were not the product of exploitation of the earlier "illegality" and were uncoerced acts of free will. *Commonwealth v. Chacko*, 500 Pa. 571, 580–82, 459 A.2d 311 (1983) (*and see* cases cited therein) ("We conclude that appellant's statement was an act of free will sufficient to break the casual connection between his initial, illegally obtained statement and his subsequent statements. Any taint thus having been purged, the latter statements were properly admitted.").

In *Oregon v. Elstad, supra,* the defendant had rendered a statement that was ruled inadmissible because of the failure to administer *Miranda* warnings, although the statement was otherwise voluntary and not coerced. In holding that subsequent statements rendered after full *Miranda* warnings were administered were admissible despite the technical illegality of the first unwarned statement, the United States Supreme Court stated:

Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of Miranda, was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative. We find that the dictates of Miranda and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement in the case in chief. No further purpose is served by imputing "taint" to subsequent statements obtained pursuant to a voluntary and knowing waiver. We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings.

470 U.S. at ——, 105 S.Ct. at 1298, 84 L.Ed.2d at 238. Thus, even assuming arguendo that appellee's first statement was in technical violation of *Edwards,* his subsequent statements were not "tainted" by that earlier "illegality," were "obtained pursuant to a knowing and intelligent waiver" and were admissible.

For the foregoing reasons, we hold that the Superior Court erred in its determination that appellee was entitled to a new trial because of the introduction of his statements of July 12–13, 1977 against him at trial. Accordingly, we reverse the order of the Superior Court which vacated the judgment of sentence and remanded for a new trial, and we remand this case to the Superior Court for disposition of appellee's remaining allegations of error.

PAPADAKOS, J., joins in this opinion.

McDERMOTT, J., joins in this opinion and files a concurring opinion.

FLAHERTY, J., files a concurring opinion.

NIX, C.J., files a concurring and dissenting opinion.

HUTCHINSON, J., files a dissenting opinion.

ZAPPALA, J., files a dissenting opinion.

McDERMOTT, Justice, concurring.

The suppression court found two salient facts: one, that the appellant was "in custody" when questioned by the police; and two, that although he asked for counsel, he voluntarily waived counsel and confessed. Both of these findings were within the responsibility of that court and, while one is not obliged to agree with them, if they are supported by the evidence they are the facts of the case. The Superior Court chose to accept one finding, that appellant was "in custody", and not the other, that the request for counsel was waived. The panel reasoned that while the suppression court's findings are solid rock, they are not required to reach the same conclusion from the same facts. Neither are we. I believe the conclusion reached by the Superior Court panel on the facts presented by the suppression court constituted an unnecessary reach for a view instead of a logic.

Notwithstanding that the appellant confessed on July 12, to a dreadful murder, he was allowed to go home. On July 13, while at home, he told his probation officer, Mr. McCool, who had consulted with him on July 12, that what he told the police on July 12, was a lie. Mr. McCool told him he best tell the police that he lied. Appellant called the police and he and Mr. McCool arranged to meet at the station house. They did, and appellant confessed again. One need not go further. Appellant was literally awash in *Miranda* warnings; he was allowed home and returned of his own accord, without counsel, either to correct a lie or tell the truth. Whatever his reason, no one forced him. Indeed, the case is sterile of any shadow of coercion and the

suppression court so found. It is a salutary rule that once counsel is requested, all questioning initiated by the police should cease. They ought not however, be required to shun prospective confessees who wish, on their own, to set the record straight.

I join in the Opinion of Mr. Justice LARSEN.

FLAHERTY, Justice, concurring.

I agree with Mr. Justice Larsen that Superior Court must be reversed, but I write separately because my analysis of the case is somewhat different from that of the Opinion Announcing the Judgment of the Court.

It is easy to lose sight of the fact that the purpose of the rule articulated in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny was to protect a citizen's Fifth Amendment right to silence and counsel against the overreaching of police. The United States Supreme Court has described the purpose of the *Miranda* rule as protecting against " 'the overbearing compulsion ... caused by isolation of a suspect in police custody,' " *Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 1144, 79 L.Ed.2d 409 (1984), and this Court has stated: "The protection of *Miranda* was designed to shield an accused from the coercive atmosphere of 'custodial interrogation' where the accused might reasonably believe that he would be held incommunicado and not be released before confessing to a crime." *Commonwealth v. Ziegler,* 503 Pa. 555, 470 A.2d 56 (1983). In general terms, of course, that is also the message of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), requiring that police questioning must end when a suspect, held in police custody, requests legal counsel. It will be recalled from *Miranda,* however, that in order for the warnings of *Miranda* to be required, the person must be subjected to custodial interrogation. Custodial interrogation is also a predicate of the *Edwards* case.

In the present case, the findings of the lower courts notwithstanding, Hubble was not in custody. Police testi-

mony was that just before Hubble gave his inculpatory statement, police told him, "If you want to go home, we'll take you home." N.T. 125. (Hubble did not own a car.) Hubble himself testified that that the police told him that if he made a statement, police would allow him to go home. N.T. 326–327. Moreover, it was only because Hubble and his wife insisted on staying in the state police barracks, *as they were on their way out the door to be taken home,* that the confession of July 12, 1977 occurred at all. And when Hubble called an advisor (his probation officer) from the police station, the probation officer, testified: "I told him that I wasn't sure whether [the public defender's office] would represent him *until he was arrested* or not, but I told him to call them and find out." N.T. 251. (Emphasis added). On these facts, it cannot be said that Hubble was in custody. He was being taken home when he insisted on staying in the police facility, where he subsequently gave a confession; just before he gave the confession, police offered to take him home; neither the police nor Hubble's own advisor thought that he had been arrested; and Hubble himself testified that after making statement he expected to be taken home.

There is a certain humor, in fact, in the lower courts' findings that Hubble was in custody. One envisions a cartoon in which police are carrying an unwilling citizen to the porch of his home, where they deposit him in a chair, and the citizen is protesting, "Please, don't force me to incriminate myself by keeping me in this awful place, separated from my familiar surroundings and the support and counsel of my family." I would hold, as a matter of law, that Hubble was not in custody.

If Hubble was not in custody at the time of his interrogation, then neither *Miranda* nor *Edwards* are applicable and the inculpatory statements were properly admitted into evidence.

Even if there were some question as to custody, however, I concur with the view of Mr. Justice Larsen that *Edwards* does not require a reversal of the conviction. Assuming

that Hubble asked for a lawyer on July 12, 1977 and that his statement to police on July 12, 1977 should be suppressed because police questioning continued in spite of the request for legal assistance, Hubble's phone call to police on July 13th, under *Edwards,* re-opened legitimate police questioning. As *Edwards* states, once counsel has been requested, the suspect is not subject to further custodial interrogation "unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 485, 101 S.Ct. at 1885, 69 L.Ed.2d at 386.

Here, Hubble initiated further conversations with police and it was proper for police to once again question him. Therefore, the subsequent confession of July 13, which was given freely and after renewed *Miranda* warnings, reaffirmed the confession of July 12, and would be admissible (along with the text of the July 12 confession). I quite agree with Mr. Justice Larsen that the fact that Hubble "let the cat out of the bag" on July 12 during what was, for the sake of argument, an improper police questioning, does not preclude the use of the July 12 confession where it was subsequently ratified during permissible police questioning on July 13. *See Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222, (1985) ("[A] suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings.") 470 U.S. at ——, 105 S.Ct. at 1298, 84 L.Ed.2d at 238.

The plain truth is that there was no police terror or brutality involved in this case. There was no overreaching. The evils which *Miranda* and its progeny seek to prevent were not present. The massive resources of government were not brought to bear to coerce a confession from a hapless citizen. Hubble was distraught and finally confessed not because of what the police did, not because government tortured and mistreated him, but because he could not live with the secret that he had participated in a terrible crime.

I join in reversing the order of Superior Court.

NIX, Chief Justice, concurring and dissenting.

I agree with the majority that there is a legitimate question regarding the "in custody" requirement of *Miranda.* I would hold, however, that appellee's trial counsel was ineffective and direct that on remand new counsel be appointed.

It is clear from this record that the issue of the voluntariness of appellee's statements should have been raised at the suppression hearing. Experts for the Commonwealth as well as for the defense testified that appellee was mildly retarded. Appellee was questioned by a state trooper with whom he had been acquainted for several years. Appellee was subjected to repeated questioning and at one point the state trooper yelled at appellee during interview. In addition, the police used appellee's wife to help elicit his confession. From the foregoing I am convinced that the claim that appellee's will had been overborne would have been of arguable merit.

The question of the violation of appellee's right to counsel during questioning is another issue not raised below which may have been meritorious. This would be an additional ground for a finding of ineffective assistance of trial counsel. I would therefore remand for the appointment of new counsel to permit consideration of these significant constitutional issues.

HUTCHINSON, Justice, dissenting.

I dissent from the outright reversal of Superior Court's order. That court ordered a grant of post-trial conviction relief, based on appellant's Fifth Amendment right to the advice of counsel, under federal case authority resulting from the United States Supreme Court's decision in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Superior Court's reversal of Common Pleas is based on its acceptance of the suppression court's finding that appellee was in custody when he asked for counsel. I would remand this case to Common Pleas for reconsideration, based on the standards set out by the United States

Supreme Court in *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), and this Court in *Commonwealth. v. McLaughlin*, 475 Pa. 97, 379 A.2d 1056 (1977), of its finding that appellee was in fact in custody when he requested counsel. To my mind, the Common Pleas findings on custody are inconsistent and seem to reflect a presently invalid independent application of the *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), focus of suspicion test. Such independent use of that test is inconsistent with the more objective standards of *Beckwith* and *McLaughlin*. *See also Commonwealth v. Chacko*, 500 Pa. 571, 459 A.2d 311 (1983). If Common Pleas reaffirms its factual finding of custody under these currently appropriate standards, I believe Superior Court's holding that the police acted to violate appellee's Fifth Amendment right not to incriminate himself is compelled by the binding authority of the United States Supreme Court in *Edwards, supra*, and *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The interpretation of those cases in the opinion announcing the judgment of the Court contrarily misapplies the United States Supreme Court's decision in *Smith v. Illinois*, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) (*per curiam*). Therefore, if Common Pleas, on remand, finds appellee gave his statement while in custody, I am reluctantly forced to conclude, as did Superior Court, that *Edwards* requires a new trial.

The opinion announcing the judgment of the Court states in its discussion of appellee's right to counsel during his interrogation that:

> the record does *not* establish that appellee "clearly and unequivocally invoked his right to counsel" so as to trigger *Edwards'* prophylactic prohibition against all further police-initiated conversation.

509 Pa. at 505–506, 504 A.2d at 172 (emphasis in original). I believe that the record contains as clear an invocation of the right to counsel as could be envisioned. The record shows that appellee said "I want a lawyer." R.R. at 113a. He

followed that statement up with "I want a public defender."
*Id.*

I agree that not every vague reference to a lawyer requires the application of *Edwards.* However, that principle has no application to the facts of this case; appellee's statement is clear and unambiguous. Indeed, I do not see how appellee could have done any more to invoke the Fifth Amendment right, which the United States Supreme Court has seen fit to afford him, to secure counsel's advice before giving an in-custody statement. The opinion announcing the judgment of the Court attempts to justify its determination that this request is not clear enough to invoke *Edwards* by reference to the fact that appellee first called a private attorney, instead of the public defender, and finally his probation officer when the private attorney was unavailable. That opinion states he did not call the public defender after being encouraged to do so. That "encouragement" included the statement of the interrogators that they did not think the public defender would be available to him because he had not been arrested. *See* R.R. at 114a (quoted in opinion announcing the judgment of the Court, *supra,* 509 Pa. at 510–511, 504 A.2d at 173). That self-serving and potentially misleading statement supports a finding that appellee was not in custody, an opinion held by the police themselves and communicated to him. It does not support a finding that he was advised of his right to free counsel before giving a statement to police. It is on this "encouragement," given after appellee's unambiguous request for counsel, that the opinion announcing the judgment of the Court concludes appellee's request was not clear because he did not follow up on it by calling the public defender.

Such an analysis is inconsistent with the recent United States Supreme Court decision in *Smith v. Illinois,* 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) (*per curiam* ). There the Court stated:

Where nothing about the request for counsel or the circumstances leading up to the request would render it

ambiguous, all questioning must cease. In these circumstances, an accused's subsequent statements are relevant only to the question whether the accused waived the right he had invoked.

. . . .

We hold only that, under the clear logical force of settled precedent, an accused's *post-request* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself. Such subsequent statements are relevant only to the distinct question of waiver.

105 S.Ct. at 494–95 (emphasis in original).

I agree that this case is controlled by *Smith*. However, its analysis of that case seems to me to stand *Smith* on its head. Here appellee clearly indicated that he wanted the assistance of counsel before he gave his statement. Even if the subsequent circumstances set out in the opinion announcing the judgment of the Court show an ambiguity in his request instead of his reliance on the police's statement that the public defender could not help him because he was not in custody, they are *post-request* irrelevancies on the issue of ambiguity, according to the teaching of the United States Supreme Court in *Smith*. Using them to cast doubt upon appellee's initial request for counsel is against both the spirit and letter of *Smith*.

It seems to me equally incorrect to state that even if appellee's request was sufficient to invoke his right to counsel he waived it by initiating the events that led up to his confession. The evidence on this record is insufficient to establish a waiver of the right to counsel which the United States Supreme Court gave this appellee in *Edwards, supra. Edwards* stated that once the right to counsel has been invoked it cannot be waived by later uncounseled interrogation unless the defendant initiates the communication. *See also Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983); *Wyrick v. Fields,* 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982) (*per*

*curiam* ); *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). *Edwards* stated:

[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

451 U.S. at 484–85, 101 S.Ct. at 1884–85. This record reveals that subsequent uncounseled interrogation was initiated, not by appellee, but by the police. The opinion announcing the judgment of the Court attempts to construct a subsequent initiation of communication by appellee by the bald statement that:

appellee initiated the events which lead to his inculpatory statement, since the prior interview had ended and appellee and Mrs. Hubble were in the process of leaving the barracks *when appellee requested to stay* and talk with his wife privately. These circumstances leading up to and surrounding appellee's requests to call "a lawyer", then Mr. Felix and Mr. McCool do not present the situation or type of police conduct condemned in *Edwards v. Arizona.*

*Supra,* at 509 (emphasis in original). This conclusion is a non-sequitur on this record. Appellee's request to speak with his wife was not an initiation of further communication with the police. A request to speak to one's spouse, albeit in a police station, is not an initiation of a communication with the police which they have an option to convert into a knowing, voluntary and intelligent waiver of ˙appellee's Fifth Amendment right to counsel. It may be true that if appellee had not asked to speak to his wife before leaving he would not have confessed later on. However, such a

"but for" analysis does not lead to the conclusion that he initiated the conversation with the police which led to his confession. On the contrary, the record shows that the police came into the room where the Hubbles were speaking and directly asked appellee if he had committed the crime:

> TROOPER SHIMKO: Sergeant Peterson and I went into the office. Again we could see that [appellee] was visibly upset. Sergeant Peterson talked to [appellee] approximately five minutes and he asked a simple question, "Now Dave, were you or weren't you in the house?" And at that time Dave broke down and stated that he was.

R.R. at 128a. Appellee did not ask to speak to the police. He asked to speak to his wife. The police interrupted them and directly interrogated him in the absence of counsel, after counsel was requested. Appellee's confession followed direct questioning subsequent to his clear invocation of his right to counsel. Under *Miranda*, if appellee was in fact in custody, under the *Beckwith* standards, all interrogation must cease after that invocation.

Whether he was in custody is, as stated, a factual issue which I cannot resolve on this record because of the ambiguities in Common Pleas' opinion. In order to clear up those ambiguities, it seems to me Common Pleas must demonstrate its understanding of the current legal standards for determining the fact of custody. In fairness to Common Pleas, however, I note that those standards had not been clearly set forth in this Commonwealth when Common Pleas considered this case.[1]

To aid Common Pleas in its task, I believe it is necessary to set forth the ambiguities I see in the Common Pleas' custody finding and the development of the law with re-

---

1. The delay in processing appellee's appeals after the denial of his post-trial motions is shocking to me. Appellee was convicted on November 25, 1977. He filed post-trial motions on December 12, 1977. The court held its hearing on these motions on August 14, 1980, and denied them on October 15, 1980. Appellee filed his notice of appeal on January 14, 1981 and Superior Court issued its order on July 15, 1983.

spect to custody interrogation. To my mind, the suppression court's findings appear so heavily influenced by the well-documented official concentration on appellee as a prime suspect that they imply independent application of the "focus of the investigation" test. This test was originally used by the United States Supreme Court in *Escobedo*, *Miranda*'s harbinger, and we adopted it in *Commonwealth v. Feldman*, 432 Pa. 428, 248 A.2d 1 (1968). The United States Supreme Court subsequently held in *Beckwith* that the focus test is not alone sufficient to invoke *Miranda*. One year later, we suggested that we would follow *Beckwith* in *Commonwealth v. McLaughlin*, 475 Pa. 97, 379 A.2d 1056 (1977). However, our subsequent cases were not as clear on the subject. *See, e.g., Commonwealth v. Horner*, 497 Pa. 565, 442 A.2d 682 (1982); *Commonwealth v. Meyer*, 488 Pa. 297, 412 A.2d 517 (1980); *Commonwealth v. Patterson*, 488 Pa. 227, 412 A.2d 481 (1980). We should repudiate the implications in these later cases and expressly follow the *Beckwith* holding that the focus test, while still a relevant factor in determining custody, is not independently sufficient to trigger *Miranda*. *See Commonwealth v. Holcomb*, 508 Pa. 425, 498 A.2d 833 (1985) (opinion announcing the judgment of the Court).

The suppression court in the instant case found that appellee was the subject of custodial interrogation. Superior Court stated that this finding was "amply supported by the record." 318 Pa.Superior Ct. at 83, 464 A.2d at 1240. This is true if the appropriate tests were applied by Common Pleas. However, I cannot tell on this record whether they were.

Many of the cases Superior Court cited are themselves based on *Escobedo's* independent focus test. *See, e.g., Commonwealth v. O'Shea*, 456 Pa. 288, 318 A.2d 713, *cert. denied*, 419 U.S. 1092, 95 S.Ct. 686, 42 L.Ed.2d 685 (1974); *Commonwealth v. D'Nicuola*, 448 Pa. 54, 292 A.2d 333 (1972); *Commonwealth v. Simala*, 434 Pa. 219, 252 A.2d 575 (1969). We should repudiate their implication that

*Escobedo* has continuing independent vitality in this Commonwealth.

Perhaps most important, the suppression court's findings on the issue of custody are internally inconsistent if not based on an independent focus test. We stated in *Chacko, supra,* that a person is in custody when

> he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation.

*Id.* 500 Pa. at 577, 459 A.2d at 314 (citations omitted).

The inconsistency of the suppression court's findings under the *Chacko* standard can be seen by comparing its finding no. 2 with nos. 13, 14 and 15. In its finding of fact no. 2 the suppression court says:

> 2. [Appellee] was the subject of a custodial interrogation throughout the day of July 12, 1977.

However, findings of fact nos. 13, 14 and 15 state:

> 13. At approximately 3:00 p.m. in the act of leaving the State Police Barracks [Appellee] said that he wanted to speak with his wife alone; they were ushered back to the same room as before and left by themselves.

> 14. [Appellee] and his wife were told one hour later they would be taken home if they wished.

> 15. [Appellee] gave his inculpatory statement to the State Police starting at or about 5:45 p.m., only after two separate conferences with his wife alone totaling a minimum of one and one half hours.

These later findings seem to imply that appellee was not in custody when interviewed on July 12. *See Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).

Because the suppression court had before it detailed evidence concerning the police investigation's focus on appellee before the July 12, 1977 interrogation, *see* R.R. 54a–68a (testimony of Officer Shimko),[2] the *Escobedo* test,

---

2. Trooper Shimko interviewed appellee about this case on April 7, 1977, July 6, 1977, July 7, 1977, July 8, 1977 and July 12, 1977.

then recently echoed in this jurisdiction by *O'Shea, supra,* *D'Nicuola, supra,* and *Simala, supra,* is a likely basis for its finding that appellee was the subject of custodial interrogation. Under that test, the focus on appellee would have been sufficient by itself to imply custody. The possibility that Common Pleas may have been relying exclusively on the focus test also appears from the following passage in the *en banc* opinion (Walter, J.) on post-trial motions. In it, the trial court says:

> In light of the above, we find that, for *Miranda* purposes, [appellee] was the subject of a custodial interrogation throughout the day of July 12, 1977. Prior to July 12, 1977 [appellee] had been questioned three times and had undergone a polygraph examination. On July 12, 1977 [appellee] was subjected to another polygraph examination and further questioning. He remained at the station for approximately eight hours.

Trial ct. slip op. at 3 (*en banc*).

The lower court nowhere makes a finding that appellee reasonably believed his freedom was restricted by the police, the custody test Mr. Chief Justice, then Mr. Justice, Nix, speaking for our Court, set forth in *Commonwealth v. Chacko, supra.* On the contrary, the record shows appellee was told several times that he could go home. R.R. 121a, 125a. Further, appellee's requests for coffee and permission to talk to his wife were always granted. R.R. 97a, 99a, 122a, 123a, 127a. Officer Shimko testified "[appellee and his wife] had freedom of the barracks.... We weren't retaining them in any way." R.R. at 181a. Indeed, the trial court itself noted these facts. *See* Findings of Fact nos. 13–16, R.R. at 382a–383a. Therefore, the trial court's blanket finding of "custody" is, on the surface, inconsistent with these other findings unless based on the independent focus test in *Escobedo,* which the United States Supreme Court repudiated as a matter of federal law in *Beckwith*

Appellee provided information about his brother's involvement in the crime. The police questioned him in the station as well as during a drive around the crime scene.

and which we should put to rest in Pennsylvania once and for all. Indeed, it is inconsistent with the express feelings of the police themselves, who told defendant they did not think he could get a public defender because he was not under arrest.

Although the record thus indicates that the suppression court incorrectly applied an independent focus test to the custody issue, there is also record evidence which would support a finding of custody under *Beckwith* and *Chacko*. Appellee was given a lie detector test and was questioned several times over an eight-hour period. During the suppression hearing, appellee said he was scared to ask about leaving and stated, "I thought I'd go to jail if I got up and walked away." R.R. at 322. Appellee's wife, who was also at the station, stated she thought they could not leave because her husband was read his *Miranda* rights. R.R. at 284. In addition, the fact that appellee was a suspect remains a relevant fact in determining the custody issue. *Beckwith, supra.* The suppression court therefore had a right to consider the suspicion the police had about appellee in evaluating all the conflicting evidence concerning his freedom to leave. Whether it incorrectly felt the focus on appellee is an independent basis in this Commonwealth for a finding of custody or merely one relevant piece of evidence which it considered in evaluating the whole suppression record for the purpose of resolving the custody issue is not apparent. Since questions involving conflicting evidence, or inferences from it, are for the finder of fact, not an appellate court, *see, e.g., Commonwealth v. Penn,* 497 Pa. 232, 439 A.2d 1154, *cert. denied,* 456 U.S. 980, 102 S.Ct. 2251, 72 L.Ed.2d 857 (1982); *Commonwealth v. Whack,* 482 Pa. 137, 393 A.2d 417 (1978); *Commonwealth v. Richman,* 458 Pa. 167, 320 A.2d 351 (1974), I believe we should remand for clarification on this point. *Cf. Jasper v. Workmen's Compensation Appeal Board,* 498 Pa. 263, 445 A.2d 1212 (1982) (court should remand cases where findings of fact are internally inconsistent). In any event, Superior Court's outright reversal of the suppression court's ruling that the evidence was admissible seems to me incorrect under the

standard governing the scope of appellate review of rulings by a suppression court:

> When ruling on suppression motions, the suppression court is required to make findings of fact and conclusions of law as to whether evidence was obtained in violation of the defendant's constitutional rights. Pa.R.Crim.P. 323(i). The suppression court must determine whether the Commonwealth has established by a preponderance of the evidence that the challenged evidence is admissible. See Pa.R.Crim.P. 323(h). On review, our responsibility is "to determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings." *Commonwealth v. Goodwin,* 460 Pa. 516, 521, 333 A.2d 892, 895 (1975).
>
> If the suppression court has determined that the evidence is admissible, "this Court will consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted." *Commonwealth v. Kichline,* 468 Pa. 264, 280, 361 A.2d 282, 290 (1976); see *Culombe v. Connecticut,* 367 U.S. 568, 604, 81 S.Ct. 1860, 1878, 6 L.Ed.2d 1037 (1961) (Opinion of Frankfurter, J.).

*Commonwealth v. Brown,* 473 Pa. 562, 566, 375 A.2d 1260, 1262 (1977). *See also Commonwealth v. Lark,* 505 Pa. 126, 477 A.2d 857 (1984).

Thus, I would remand this case to Common Pleas for reconsideration of this custody question. However, if compelled to reach the question of appellee's right to counsel, my reading of the United States Supreme Court's opinions in *Smith* and *Edwards,* which are binding on us, seems to me to force us to affirm the grant of a new trial, contrary to the reasoning on this issue in the opinion announcing the judgment of the Court.

ZAPPALA, Justice, dissenting.

I join in the dissent of Mr. Justice Hutchinson only insofar as his opinion would hold that Appellee effectively

532

invoked his right to counsel and did not, thereafter, effectively revoke same. I disassociate myself, however, from that part of the dissenting opinion which addresses the "focus of the investigation" aspect which Mr. Justice Hutchinson perceives to be present in this case but which I cannot find under these facts and which renders this discussion unnecessary. Rather, I find that Appellee was clearly in custody when his request was made, and would, as I did in *Commonwealth v. Holcomb* (At 508 Pa. 425, 498 A.2d 833, Zappala, J. dissenting), suggest that we save for another day any further discussion of "focus of the investigation's" place in Pennsylvania jurisprudence until such time as the facts place the issue squarely before this Court. In so doing, we shall not add to the confusion of the law in this area by further cluttering it with unnecessary dicta.