### In the Interest of N.L.

### Appeal of N.L.

Superior Court of Pennsylvania.

Submitted Aug. 4, 1997.
Filed April 28, 1998.

John W. Packel, Assistant Public Defender, Philadelphia, for appellant.

Peter J. Gardner, Assistant District Attorney, Philadelphia, for Com., participating party.

Before DEL SOLE, TAMILIA and OLSZEWSKI, JJ.

TAMILIA, Judge:

This appeal was taken from the Order of Disposition entered following the denial by the trial court, Juvenile Section, Family Division of the Philadelphia Court of Common Pleas, of appellant's motion to suppress the statement given to the police on August 23, 1996. The facts incorporated in the Opinion of the trial judge accurately summarize the testimony contained in the trial transcript.

On August 22, 1996, at approximately 3:00 p.m., the defendant's father, A.L., returned home from work. He went upstairs and found the bedroom door closed, but he could hear noises from within the room. A.L. opened the bedroom door and upon entering the room, he found his eldest son, the defendant, in bed lying on top of his two-and-one-half year old step-brother. He saw defendant rubbing his body against the victim's body, and he saw defendant kiss the victim. A.L. also noticed that defendant had an erection. Upon being smacked by A.L., defendant cried and said, "that he didn't know what got into him, that he was sorry." A.L. then sent defendant to his grandmother's house, and while there A.L. called the police regarding the incident. The police went to the grandmother's house and arrested the defendant.

Defendant was brought to the Sex Crimes Unit of the Philadelphia Police Department at 5301 Tacony Street at approximately 5:00 p.m. Officer Doris Daniels, the assigned investigator, then placed a phone call to defendant's parents at Children's Hospital, where they were tending after defendant's step-brother, the complainant. The officer asked to speak with defendant's mother and A.L.'s wife, R.L. came to the phone. Officer Daniels asked if she was defendant's mother, and R.L. responded that she was. The officer then asked R.L. for permission to take a statement from the defendant. *Officer Daniels told R.L. that "he did not have to talk [to the police] and she did not have to give*

*permission and that he was entitled to have an attorney [present]."* R.L. consented to the interview, and Officer Daniels then asked if a parent wanted to be present while the interview was being conducted and R.L. said that they did not want to be present.

R.L. is in fact the defendant's stepmother and the biological mother of the defendant's step-brother, the complainant. When Officer Daniels spoke to R.L. on the phone, the officer believed that she was speaking to the defendant's biological mother because R.L. identified herself as defendant's mother. R.L. testified that defendant has often come to live with her and his father and that she acted as his mother. A.L., defendant's father, was at the hospital with R.L. when she gave Officer Daniels permission to interview the defendant, however, neither parent desired to be present during the interview.

At approximately 5:55 p.m. Officer Cheryl Monzo of the Sex Crimes Unit read defendant his rights. While this occurred, defendant and Officers Monzo and Daniels were seated in the interview room at the Sex Crimes Unit. Officer Daniels was seated behind the desk at a typewriter, defendant was seated in a chair next to the desk and to the left of Officer Daniels, and Officer Monzo was seated in a chair in front of the desk.

The Officers were aware that the defendant was fourteen years of age, and prior to beginning the interview Officer Monzo asked him if he was hungry and whether he wanted half of her tuna salad hoagie. Also, Officer Daniels asked defendant if he wanted to use the rest room. The defendant accepted neither of these offers. Officer Monzo then asked the defendant if he could read, write and understand the English language; the defendant replied that he could, but "he didn't understand big words." The Officer then had the defendant read the first *Miranda* warnings outloud to her. The defendant was able to read the question without difficulty.

The officer then proceeded to read defendant his *Miranda* rights off a printed form. After reading each question, she asked defendant if he understood what the question meant. Officer Monzo also had defendant write out each of his answers next to the question and initial his answer. When the officer came to the third question, she asked the defendant, "Do you want to remain silent?" In response, defendant wrote, "yes," on the sheet. The Officer then asked defendant, "Do you not want to talk to me about this incident and what happened?" The defendant replied, "I do want to talk to you." Officer Monzo then had defendant read the question again and he then crossed out "yes" and wrote the word "no." Officer Monzo went through the remaining questions, which the defendant answered in writing and initialed. The officer then returned to question number three.

The officer told defendant that if [he] did not want to speak to her, he did not have to, that he could remain silent and that this was his Constitutional right. The Officer wanted to make sure that defendant understood that he had the right to remain silent, and she had him read the question again and then asked him whether he understood the question and his answer. Officer Monzo then told defendant to write out his reply; he wrote, "I do want to talk to you," which he then initialed. Officer Monzo felt that the defendant understood all the questions and what he was responding to. The defendant then signed his statement waiving his *Miranda* rights, and the officers also signed the statement.

Officer Daniels, with Officer Monzo present, then conducted an interview of the defendant, asking him questions about the incident and typing out the questions and defendant's answers. At this time defendant gave a full statement concerning the incident. The defendant then read the questions and answers back to the officers and initialed the page. After reading out the first question, defendant became upset and Officer Daniels sat next to him and read out the remaining questions and defendant's answers pointing the words out to the defendant with her finger as she read, and the defendant initialed each one after it was read to him. The interview

was completed at 7:28 p.m. Defendant was then given the opportunity to make any changes or correction to the statement, and he declined to do so. Defendant then signed the statement and wrote the date and the time when the interview was completed.

(Slip Op., Dempsey, J., 2/27/97, pp. 2–6; emphasis added; citations omitted.)

This Court in *In the Interest of Pack*, 420 Pa.Super. 347, 616 A.2d 1006 (1992), reaffirmed the rule announced in *Commonwealth v. Williams*, 504 Pa. 511, 475 A.2d 1283 (1984), that "[a] determination of whether a juvenile knowingly waived his *Miranda* rights and made a voluntary confession is to be based on a consideration of the totality of the circumstances, including a consideration of the juvenile's age, experience, comprehension and the presence or absence of an interested adult." *Pack, supra* at 357, 616 A.2d at 1011 (1992), *citing Commonwealth v. Morningwake*, 407 Pa.Super. 129, 595 A.2d 158 (1991), *allocatur denied*, 529 Pa. 618, 600 A.2d 535 (1991). If under the totality of circumstances there appears to be no errors of law or issue of fact that would contravene the findings of the lower court in a suppression review, we may not reverse. *Id.*

The appellant now alleges the Juvenile Court erred in denying appellant's motion to suppress statements given to the police inasmuch as the Commonwealth failed to establish appellant's knowing, voluntary and intelligent waiver of *Miranda* rights judged under the totality of circumstances test governing juvenile confessions, the Commonwealth failed to establish appellant understood the warnings, he had no opportunity to consult with an interested adult and, finally, appellant unambiguously asserted his right to remain silent, which was not honored by the police.

It appears the appellant differs with the trial court in three areas. First, that appellant may not have understood "big words", second, the person giving consent to go forward with questioning was appellant's stepmother, the biological mother of the victim, and third, that appellant was only 14 years of age. Under the doctrine enunciated in *Williams*, none of these conditions separately

would have been a basis for suppressing the statements, and looking at this case from the standard of totality of circumstances, their combined effect did not enhance or compromise the individual effect of each. As stated below, this is an area of discretion and deference which must be accorded the trial court.

At the outset, the trial court found there was no duress, mistreatment or coercion in obtaining the statement and that it was voluntary. Our review of the record is in complete accord with this finding. This overcomes the primary hurdle that must be traversed in questioning a juvenile and complying with *Miranda*. Once we find that the coercion, duress or lack of voluntariness is absent, as the trial court found, the focus turns to whether the statements were knowing and intelligent and in the presence of an interested adult. In analyzing the case *sub judice* and the evolution of the exclusionary rule as it applies to juveniles, the trial court tracks *Williams, supra*, practically in its totality, and applies the standard which it promulgates.

Fundamentally, *Williams* determined that too much consideration was given to protecting the child's interest while ignoring the interests of society. In doing so, the court eschewed the use of a per se rule but required that the factors applicable in each case are unique to the circumstances of that case and the level of development and experience of the juvenile. As a starting point, the Supreme Court in *Williams* stated:

> We now reject the application of a rebuttable presumption that a juvenile is incompetent to waive his constitutional rights *without first having an opportunity to consult with an interested and informed adult*. The presumption adopted in [*Commonwealth v. Christmas*, 502 Pa. 218, 465 A.2d 989 (1983) ] serves no useful analytic purpose. The so-called presumption is not a presumption at all since it merely verifies the Commonwealth's established burden of proving a knowing, intelligent and voluntary waiver on the part of a juvenile.

*Id.* at 521, 475 A.2d at 1287, 1288 (emphasis added).

Thus it appears that although the parents were not present, this is not a significant factor in determining whether the waiver is voluntary. The parents were consulted prior to questioning and, acting through the stepmother, gave consent to questioning and declined the right to be present at the interrogation. In addition to being offered the opportunity to be present, she was told of the child's right to remain silent and his right to counsel (S.T., 9/9/96, pp. 20–21, 27). While some concern is expressed in appellant's brief that the stepmother, rather than the biological father, gave consent, nothing in the record indicates she was not an interested adult or that the father, who was present with her at the hospital attending the toddler who was assaulted, did not concur with her in this decision. If the case is otherwise, our standard of review requires the appellant to prove the absence of an interested adult on the record. This may not now be presumed.

In these times, where more than half of marriages end in divorce, and over half of children conceived are likely to live in a home with a step-parent, others are in adoptive homes or foster homes, and still others are in grandparents or relatives homes or with people who establish an *in loco parentis* relationship, we cannot assume a step-parent or other *in loco parentis* relationship nullifies the interested adult requirement. Additionally, this case originated on the complaint of the natural father of both appellant and the victim, and it is irrational to conclude that because he did what was legally required of him to protect his toddler son, he shed his role of interested parent for the appellant. In juvenile cases, the vast majority of children who pass through juvenile court return to their families, and the theory and practice is to provide the greatest rehabilitation possible to assure correction of the problem. Can it reasonably be held that the parents were not interested in assuring appellant's cooperation with the police and eventually the court because they wanted a safe environment for their 2–year old while assuring their 14–year old would be helped and thereby remain part of the family and avoid possible incarceration for similar behavior as an adult? The result desired by the family and the court was achieved by returning appellant home on probation to be involved with sex offender counseling and family counseling. The likelihood of this type of resolution would be diminished if the parents were not considered to be interested adults and were forced into an adversarial relationship with their child. The paradox in juvenile cases, when the offense centers about crimes involving family members, is the insertion of an independent adult in the equation, such as an attorney, who may advise the child, not in the child's best interest, but as to what counsel believes are the technical, legal rights available to the child, thereby refusing to waive those rights. It is just this conflict which *Williams* sought to avoid by abrogating a per se rule and adopting the totality of circumstances standard. In this case, again looking to the totality of circumstances, the appellant was caught in the act by the father, the father reported it to the police and cooperated in the investigation and was the primary witness at the hearing on the charges. If we return to the per se rule abrogated by *Williams,* it is likely that the parents could not have been cast in the role of interested adults. Under the totality of circumstances criterion, that role is given no more weight than other factors, including youth, experience and comprehension.

As to his youth, appellant was 14 years of age. This alone is not a controlling factor. The trial court had the opportunity to evaluate the relationship between appellant's youth and his capacity to make a knowing and intelligent waiver and, in carefully reviewing the evidence presented relating to the questioning by the police, determined his intelligence, knowledge and maturity were sufficient to preclude an involuntary waiver.

The evolution of the treatment of juveniles over the past 20 years by the legislature and the courts evidences recognition that children are more sophisticated, knowledgeable and inclined to commit more serious crimes. The across-the-board classification of delinquency as any crime committed by a child under the age of 18 (except murder) has, in the case of many serious crimes committed with weapons or involving violence, including some of those charged in this case, been reduced to

15 years of age. *See* 42 Pa.C.S. § 6302, **Delinquent Act.** In those crimes, it is incumbent upon the juvenile to establish his amenability to juvenile court processes by petitioning the criminal court. Furthermore, at the age of 14, under certain findings by the juvenile court pursuant to section 6355, **Transfer to criminal proceedings,** the child may be certified for trial as an adult in criminal court. Only below the age of 10 years is it presumed a child is not competent and therefore is to be adjudicated a dependent child. *See* 42 Pa.C.S. § 6302(7), **Dependent Child.** In addition, legislation enacted in 1995, effective in March 1996, dramatically tightened the interpretation and construction of the Juvenile Act, 42 Pa.C.S. § 6301(b), **Purposes,** by amending subsection b(2) as follows:

> (2) Consistent with the protection of the public interest, to provide for children committing delinquent acts programs of supervision, care and rehabilitation *which provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable children to become responsible and productive members of the community.*

*Id.* (emphasis on amendment). This legislative mandate coupled with *Williams* requires even a 14–year old to stand up to his responsibility for acts he committed and requires the court to incorporate that more stringent philosophy into any treatment plan.

The appellant also focuses on the confusion caused by his initial response that he did not want to answer questions. Without excessive pressure or interrogation by the police, the response was clarified and the appellant replied convincingly that he wished to answer the questions. Similarly, the use of a signature in response to instructions to place his initials following the changed answer is given too much weight by appellant. It is likely that many adults, not familiar with initialing changes in legal documents, would do the same.

It is apparent that the appellant is ignoring the requirement of the standard of review applicable to suppression cases. The trial court, as detailed in a comprehensive and thoughtful Opinion, exhibited a full comprehension of the law and applied all relevant legal considerations to a careful review of the facts.

When we review an order denying a motion to suppress evidence, we must determine whether the factual findings of the trial court are supported by the evidence of record. *Commonwealth v. Donahue,* 428 Pa.Super. 259, 278, 630 A.2d 1238, 1247 (1993), *allocatur denied in,* 538 Pa. 612, 645 A.2d 1316 (1994) (citations omitted). In making this determination, this court may only consider the evidence of the Commonwealth's witnesses, and so much of the witnesses for the defendant, as fairly read in the context of the record as a whole, which remains uncontradicted. *Id.* If the evidence supports the findings of the trial court, we are bound by such findings and may reverse only if the legal conclusions drawn therefrom are erroneous. *Id.*

*Commonwealth v. Jackson,* 451 Pa.Super. 129, 133, 678 A.2d 798, 800 (1996).

The appellant impermissibly would have us substitute our judgment for that of the trial court. In evaluating the witnesses, the trial court has the advantage over this Court in determining those critical issues of credibility, demeanor and competence. We believe this case should be determined by that careful evaluation expressed by the trial court which is fully supported by the record.

> My observations of defendant in court leads me to believe that he is a juvenile of average or above average intelligence. He presented as a respectful young person.

> On August 22, 1997, defendant felt sincere remorse for what he did to his brother. This remorse motivated his statement. The police showed compassion for this troubled young person.

> Upon careful consideration of the totality of the circumstances, this Court finds that the defendant was fully informed of his Constitutional rights, and while he was understandably upset while in police custody, he knowingly, intelligently and voluntarily waived his right to remain silent and

gave a detailed incriminating statement to the police officers.

(Slip Op., Dempsey, J., 2/27/97, pp. 9–10.)

For this Court to overrule the carefully weighed factual findings established by the trial court, based upon more than sufficient evidence of record, once again will insert technical considerations, lending nothing to an appropriate analysis of a voluntary admission under the exclusionary rule flowing from *Miranda*, that have been discarded by *Williams*.

Having affirmed the trial court's denial of suppression of appellant's statement, the Order of Disposition is affirmed.

Order of Disposition affirmed.

Dissenting Opinion by OLSZEWSKI, J.

OLSZEWSKI, Judge, dissenting:

While the expression of the majority view provides a persuasive analysis and sound rationale, I am obliged to differ and respectfully dissent.

Initially, I disagree with the majority's application of our standard of review. Whether a *Miranda* waiver is knowing and intelligent is not a mere factual finding, but rather a mixed question of fact and law. We need not defer to the trial court's resolution of such matters. Courts in this Commonwealth consistently treat similar issues as questions of law. *See Commonwealth v. Whitehead,* 427 Pa.Super. 362, 629 A.2d 142, 145 (1993) (treating the finding that the defendant was in custody requiring *Miranda* warning as a question of law upon review); *Commonwealth v. Daniels,* 406 Pa.Super. 112, 593 A.2d 895, 896 n. 3 (1991) ("trial court's conclusion that [defendant] 'acquiesced' rather than 'consented' [to a search] is not a factual finding by which we are bound, but is a legal conclusion drawn from the findings of fact"). Also, federal courts apply plenary review to the analogous question of the voluntariness of a *Miranda* waiver. *See, e.g., U.S. v. Cruz,* 910 F.2d 1072, 1079 (3d Cir.1990); *U.S. v. Yunis,* 859 F.2d 953, 958 (D.C.Cir.1988) (trial court decision whether a waiver of fifth and sixth amendment rights is voluntary, knowing, and intelligent is reviewed *de novo* ). More importantly, our Supreme Court has

recently held, "[w]hether a confession is voluntary is a conclusion of law, and conclusions of law are subject to plenary review." *Commonwealth v. Nester,* — Pa. —, 709 A.2d 879, 881 (1998) (citations omitted). Therefore, our current task is to ensure the record supports the suppression court's findings of historical fact, and then decide whether these facts amount to a knowing and intelligent *Miranda* waiver as a matter of law.

The record supports the following factual findings. At the time of the waiver, appellant was a fourteen-year-old boy with no previous experience with the police. Appellant exhibited some confusion when the police read him his *Miranda* rights. Before waiving his rights, appellant did not consult with an interested adult. Appellant is an intelligent juvenile who feels remorse for his conduct.

Next we must determine whether these facts amount to a knowing and intelligent waiver under the law. As stated by the majority, whether a juvenile confession is knowing and voluntary depends upon the totality of circumstances. *See Commonwealth v. Williams,* 504 Pa. 511, 521, 475 A.2d 1283, 1288 (1984). Among the circumstances that must be considered are the juvenile's age, experience, comprehension and the presence or absence of an interested adult. *Id.*

When applying this test, I differ with the majority's conclusion that after *Williams* the absence of an interested adult is no longer a significant factor. *Williams* states that there is no analytical difference between the prior rebuttable presumption that an uncounseled waiver is invalid and that the Commonwealth has the burden of proving the validity of such a waiver. *Id.* In other words, the law before and after *Williams* is identical except for the terminology used. Accordingly, as consultation was an important factor before *Williams,* so it remains today.

This brings me to a fundamental disagreement I have with the majority and the trial court. Both emphasize that appellant's stepmother granted the police permission to interrogate appellant. The controlling question before us, however, is whether appellant

knowingly and intelligently waived his *Miranda* rights. While I agree that a stepmother may qualify as an interested adult, the fact that she consented to appellant's interrogation without first consulting him is irrelevant to the determination of a knowing waiver by appellant. The caselaw clearly considers the opportunity of the interested adult to consult with appellant before waiver occurs, not whether the adult agreed to interrogation. *See, e.g., In the Interest of Pack,* 420 Pa.Super. 347, 616 A.2d 1006, 1011 (1992) (defendant consulted mother over phone before waiving *Miranda* rights); *Commonwealth v. Morningwake,* 407 Pa.Super. 129, 595 A.2d 158 (1991) (defendant given opportunity to consult with counselor before waiving *Miranda* rights). In short, I fail to see how the stepmother's permission in any way effects the knowing-and-intelligent character of appellant's waiver.

Because of this misplaced emphasis and the fact that the other *Williams* factors weigh against valid waiver, I would remand to the trial court. Upon remand, the trial court should consider the proper legal factors in deciding whether appellant understood the consequences of his actions and thereby rendered a knowing and intelligent *Miranda* waiver.