**Commonwealth v. Rivera**

C.P. of Lehigh County, no. CR-2658-2010.

*Christie Bonesch, chief deputy district attorney,*

and *Gregory Englert, assistant district attorney,* for Commonwealth.

*Richard Webster,* for defendant.

STEINBERG, *J.,* January 4, 2011—The defendant, Angel Rivera, is charged with criminal homicide,[1] attempted criminal homicide,[2] aggravated assault[3] (2 counts), persons not to possess, use, manufacture, control, sell or transfer firearms,[4] and possession of firearm by minor.[5] It is alleged that the defendant shot Barbara Heinrich and Francisco Fordham multiple times. Ms. Heinrich died of her wounds and Mr. Fordham was seriously injured.

On September 3, 2010, Omnibus pre-trial motions were filed on behalf of the defendant seeking, in pertinent part,[6] the suppression of the defendant's statements to members of the Allentown Police Department. The defendant contends that he did not knowingly and intelligently waive his *Miranda* rights. In that regard, the defendant alleges that he was "not afforded the opportunity to consult with an interested adult despite the fact that he is a juvenile."[7] The defendant also maintains that he requested counsel, exercised his right to remain silent, and

1. 18 Pa. C.S. § 2501(a).
2. 18 Pa. C.S. § 901(a), § 2501(a).
3. 18 Pa. C.S. § 2702(a)(1), (4).
4. 18 Pa. C.S. § 6105(a)(1).
5. 18 Pa. C.S. § 6110.1(a).
6. On December 7, 2010, the date the hearing commenced on the Omnibus pre-trial motions, the "motion for decertification from adult criminal proceedings and transfer to Juvenile Division of the Lehigh County Court of Common Pleas" was withdrawn by defense counsel. Additionally, the defendant's supplemental omnibus pre-trial motion nunc pro tunc was granted, and as a result, the charge of persons not to possess, use, manufacture, control, sell or transfer firearms was severed from the remaining charges.
7. Omnibus pre-trial motions, ¶32.

once he did so, all interrogation was required to cease.

During the suppression hearing held in this matter, it was learned that the defendant was apprehended on May 26, 2010, at approximately 8:01 p.m., which was five days after the shooting. Detective Mark Boyer of the Allentown Police Department testified that following the defendant's apprehension, he was not interviewed until 11:00 p.m. The reason for the delay, according to Detective Boyer, was the need to create and present a photographic display to witnesses, including Francisco Fordham, who remained hospitalized from the shooting.

Due to the defendant's age, Detective Erik Landis also contacted the defendant's mother, Rosalind Rivera, prior to conducting an interview. The detectives and Ms. Rivera's versions of what transpired during their conversation, as well as subsequent events, clash. Detective Landis testified that once he reached Ms. Rivera, she was reluctant to come to police headquarters. She explained that the defendant was a "grown man" who had been out of her home for "three months." When Detective Landis offered her a ride to headquarters, she declined the invitation. She told Detective Landis that the defendant was a "grown up," and she had nothing to do with him. Detective Boyer confirmed this account of the events, including Ms. Rivera's unwillingness to come to headquarters. Ms. Rivera, who also testified at the suppression hearing, admitted that the defendant had not been living with her for two and one-half weeks,[8] but denied that she expressed

---

8. The defendant, during his interview with the police, told them that he had not been living with his mother for approximately three (3) months. Transcript of interview, p. 13.

any reluctance to come to headquarters.

The disagreement over the conversation between Detective Landis and Ms. Rivera has little effect on this controversy, because Ms. Rivera appeared at headquarters, according to Detective Landis, at approximately 10:45 p.m. Detective Landis testified that Ms. Rivera called back and told him she would be coming to headquarters. Ms. Rivera testified that she came to headquarters shortly after 11:00 p.m. with Anthony Bivins. She denied that she needed to be coaxed.

When Ms. Rivera arrived at headquarters, the version of events is again in dispute. Detectives Landis and Boyer testified that Ms. Rivera was escorted to the juvenile division and told about the shooting/killing. Ms. Rivera made comments about her son similar to her earlier conversation with Detective Landis, and requested to wait in her vehicle. According to the detectives, she never requested to see her son. Ms. Rivera, on the other hand, testified that she wanted to see her son, but Detective Landis told her that he needed to speak with the defendant "a little more." Ms. Rivera and Mr. Bivins claimed that they waited outside in their car for a "good two to three hours."

Both the Commonwealth and the defendant do agree that when the initial interview with the defendant commenced, Ms. Rivera was not present in the interview room. The tape and transcript of the interview with the defendant reflect that the interview with him began at 11:05 p.m., with some brief preliminary background questions. The defendant was then advised of his Miranda

rights. The defendant, after being verbally advised of his rights, signed the written version of the Miranda rights[9] at approximately 11:08 p.m. Thereafter, the defendant was interviewed until 11:30 p.m. during which time the defendant denied any involvement in the shooting.

During the next 129 minutes, no formal interview was conducted with the defendant, although Detective William Lake, Detectives Boyer and Landis and District Attorney James Martin all spoke with the defendant. Detective Lake, who was with the defendant from approximately 12:45 a.m. until 1:10 a.m., primarily talked with the defendant about his younger brother. The defendant did not request counsel, nor did he indicate any wish to remain silent during Detective Lake's presence or throughout the break in the formal interview process. Once again, the defendant did not implicate himself in the shooting. He did, however, request to speak with his mother.

Ms. Rivera was brought to the defendant at approximately 1:30 a.m. She was allowed to speak alone with the defendant for approximately five (5) minutes, and was present throughout the remaining interview, which commenced at 1:39 a.m. She described the defendant as dirty, with no shirt or shoes and under the influence. This testimony is in sharp contrast to Detective Lake, who testified that some time prior to his appearance in the interview room at 12:45 a.m., the defendant was provided with a shirt. It was also his opinion, that the defendant was not intoxicated or impaired.

Prior to asking the defendant specific questions during

9. Commonwealth's Exhibit 1.

this phase of the interview process, Detective Landis reminded the defendant of his Miranda rights, and the defendant acknowledged that he understood them, and that they were still in effect.[10] The defendant told the detectives and his mother that, "Supreme" owed him $400 for "some drugs."[11] When he reached "Supreme's" residence, the two had a conversation, and at some point "Supreme had the gun on me."[12] The defendant then described the events as follows:

ANGEL RIVERA: Then it sounded like he, he went to go cock something. The girl, he was looking at the door, the girl was standing here with her back towards him, he was in front of them and sounded like he cocked something back. So I thought in my head its either my life or his, you feel me? So that's when I just let off the first few shots. I hit her in the back two times. She fell. I let off another shot. I guess that is the one that caught him in the face or something like that.

DET. LANDIS: Ok.

ANGEL RIVERA: Then he ran into the house and I ran in after him, told him all I want is my bread. He didn't say nothing, he tried to come out but he ran like, it looked like he, I don't know what he had in that bathroom, if ya'll found in that bathroom. It looked like he had some type of rifle or something like that. So, that's when I just started backing up and I just let off the whole clip. And then I ran out the house. I ran

---

10. Transcript of interview, p. 20.
11. *Id.* pp. 21,23,35.
12. *Id.*

towards, I was on 8th (PAUSE) and I ran into a back yard and I stood there for a while until like everything calmed down. That's when I left.[13]

The defendant then described how he discarded the Ruger "inside a back door, inside of a bag."[14] He claimed to have found the loaded weapon on the street. The interview was concluded at 2:04 a.m.

## Discussion

### A. *Waiver of Miranda Rights*

The defendant's initial claim is that he did not knowingly and intelligently waive his *Miranda* rights. More specifically, the defendant points to his age at the time of the interview, his physical condition, and the absence of his mother during the initial interrogation.

Any statements secured after administering *Miranda* rights are admissible provided the accused's right to remain silent and right to counsel have been explained and the accused has knowingly and voluntarily waived those rights. *Commonwealth v. Davis*, 861 A.2d 310, 317 (Pa. Super. 2004), citing *Commonwealth v. Jones*, 546 Pa. 161, 178, 683 A.2d 1181, 1189 (Pa. 1996). The burden of proving by a preponderance of the evidence, the voluntariness of a confession, and whether an accused knowingly waived his rights, rests with the Commonwealth. *Commonwealth v. Hughes*, 477 Pa. 180, 186, 383 A.2d 882, 885 (Pa. 1978); *Commonwealth v. Moore*, 454 Pa. 337, 311 A.2d 620 (Pa. 1973). To determine whether the Commonwealth has

---

13. *Id.* pp. 24, 29-34.
14. *Id.* p.25.

met its burden of proof, the totality of the circumstances surrounding the giving of the confession must be examined. *Davis*, 861 A.2d at 317. Some of the factors the suppression court should consider include, "the duration and the methods of interrogation; the conditions of the detention, the manifest attitude of the police toward the defendant, the defendant's physical and psychological state and all other conditions present which may serve to drain one's power of resistance to suggestion and undermine his self-determination." *Commonwealth v. Perez*, 577 Pa. 360, 373, 845 A.2d 779, 787 (Pa. 2004);[15] *Commonwealth v. Hunt*, 398 A.2d 690, 692 (Pa.Super. 1979). Additionally, when evaluating whether a juvenile knowingly waived his Miranda rights and made a voluntary confession, the juvenile's age, experience, comprehension and the presence or absence of an interested adult are all part of the totality of the circumstances equation. *Commonwealth v. Harvey*, 571 Pa. 533, 548, 812 A.2d 1190, 1199 (Pa 2002).

The defendant, who was 16 at the time of his arrest, had prior experience with the police before he was interviewed.[16] An "Independent Psychiatric Evaluation"

---

15. The court in *Perez* also identified as other relevant factors "the accused's age; his level of education and intelligence; the extent of his previous experience with police; the repeated and prolonged nature of the questioning; the length of detention prior to the confession; whether he was advised of his constitutional rights; whether he was injured, ill, drugged, or intoxicated when he confessed; whether he was deprived of food, sleep, or medical attention; and whether he was physically abused or threatened with abuse." *Perez*, 845 A.2d at 785, citing *People v. Cipriano*, 429 N.W.2d 781 (Mich. 1988).

16. The depth of the defendant's delinquent history is revealed in Commonwealth's Exhibit 5. On February 1, 2006, he was adjudicated delinquent in Lehigh County on charges of Possession of Weapon on School Property, namely a BB gun and a straight razor. He was 12. On

prepared on October 5, 2008, during his detention at the Northampton County Juvenile Justice Center, described him as "slightly above average intelligence with a slightly above average fund of general information for his age."[17]

The defendant demonstrated his intelligence by fending off the detectives initial inquiries regarding the homicide. During the twenty-two minute interview, following the defendant's acknowledgement of his *Miranda* rights, he was able to resist any attempt on the part of the detectives to secure an admission. It cannot be seriously argued that the defendant's power of resistance to suggestion or his self-determination were drained by the length of the interview or the detectives conduct towards him.

His admissions to these offenses did not occur until after he was provided the opportunity to consult privately with his mother. She was also present throughout the interview that commenced at 1:39 a.m. and ended 23 minutes later. Although the defendant admitted to the shooting, he also maintained his composure throughout the interview. He placed a gun in the hands of "Supreme," claimed that he found the loaded firearm on the street, and did not want to discuss where he received the drugs for sale.

In *Commonwealth v. Williams*, 504 Pa. 511, 521, 475 A.2d 1283, 1288 (Pa. 1984), the totality of the circumstances analysis was adopted "to all questions involving the waiver

---

March 31, 2008, he was adjudicated delinquent in Northampton County on charges of Simple Assault and Burglary, which occurred on January 18, 2008, and March 15, 2008, respectively. The burglary involved the defendant entering a garage with a conspirator and removing items, including a loaded 22 caliber pistol.

17. Commonwealth's Exhibit 5. Independent Psychiatric Evaluation prepared by Larry E. Dumont, M.D., p. 3.

of rights and the voluntariness of confessions made by juveniles. All of the attending facts and circumstances must be considered and weighed in determining whether a juvenile's confession was knowingly and freely given." The presence or absence of an interested adult is a factor, but is not preemptive in resolving the *Miranda* waiver.

The defendant in *Williams*, like Angel Rivera, was not subjected to physical or psychological abuse. Both were of normal intelligence and responsive to the questions asked of them. They were not threatened, nor were any promises made to them. Neither *Williams* nor the defendant were questioned for any lengthy period of time. Finally, both of them had the opportunity to speak with a parent and have that parent present during the interrogation. See also *Commonwealth v. Carter*, 855 A.2d 885 (Pa.Super. 2004) (Sixteen year old convicted of felony murder knowingly and intelligently waived his *Miranda* rights even though no interested adult was present. Totality of the circumstances including the defendant's prior history with the legal system, the short duration of the interview, the absence of any physical or verbal intimidation, and the defendant's written and taped confession all supported the voluntariness of the confession). *In Interest of N.L.*, 711 A.2d 518 (Pa. Super. 1998) (Fourteen year old knowingly waived his *Miranda* rights even though interested adult was not present, and juvenile had no prior experience with juvenile system).

The defendant's reliance on *In the Interest of T.B.*, 2010 WL 4196045 (Pa. Super. October 26, 2010), in which the juvenile, who was 15, admitted to a series of burglaries is misplaced. The juvenile in *T.B.*, had an I.Q. of 67, read at a

third grade level, and had never been previously arrested. Furthermore, while the juvenile's mother permitted the police to interview him, she did not attend the interview nor did the juvenile consult with her. Based upon those circumstances it was held that the juvenile's *Miranda* waiver was unintelligently and unknowingly entered. Here, the defendant was more sophisticated with the criminal justice system, more intelligent, and consulted with his mother prior to his admissions. She was also present during the interview in which the admission was elicited. The waiver in this case is analogous to *Williams*, supra., and not *T.B.*

The defendant also claims his physical condition thwarted his cognitive abilities. Specifically, Ms. Rivera testified that the defendant was under the influence, lacked a shirt and shoes, and was dirty. However, she never raised such concerns while the interview was unfolding. Additionally, Ms. Rivera's observations were strongly refuted by the experienced detectives who testified that the defendant was not under the influence. The voluntariness of a confession may be based solely on the credible testimony of the investigating officer. *Commonwealth v. Cornish*, 471 Pa. 256, 370 A.2d 291 (Pa. 1977); *Commonwealth v. Smith*, 447 Pa. 457, 291 A.2d 103 (Pa. 1972). They also testified that, while in their custody, the defendant was provided with a shirt and food. Furthermore, all of the defendant's statements, which this court has reviewed, demonstrate his responsiveness to the questioning. Nothing in the conditions of detention, nor the "manifest attitude of the police toward the defendant served to drain his power of resistance to suggestion and

undermine his self-determination."

While this court concludes that the detectives' testimony was more credible than Ms. Rivera, even if the defendant had consumed an intoxicant that does not automatically render statements inadmissible. *Commonwealth v. Edwards*, 521 Pa. 134, 141, 555 A.2d 818, 822 (Pa. 1989); *Commonwealth v. Ventura*, 975 A.2d 1128, 1138 (Pa. Super. 2009)

> The test is whether [the defendant] had sufficient mental capacity at the time of giving his statement to know what he was saying and to have voluntarily intended to say it. Recent imbibing or the existence of a hangover does not make his confession inadmissible, but goes only to the weight to be accorded to it.

*Id.* citing *Commonwealth v. Adams*, 561 A.2d 793, 795 (Pa. Super. 1989).

The totality of the circumstances supports the conclusion that the defendant had the cognitive awareness to understand the *Miranda* warnings and to knowingly, voluntarily, and intelligently waive them. The Commonwealth has met its burden of proof.

B. *Right to Counsel*

The defendant asserts that he invoked his right to counsel just prior to the end of initial interrogation when the following exchange occurred:

DET. BOYER: Do you wanna talk to the district attorney and let him know that, that you think we're bullshitting here?

ANGEL RIVERA: I don't know, who's the District Attorney?

DET. LANDIS: He's the top dog in the county. He's the guy that's going to be prosecuting you. (PAUSE) No?

ANGEL RIVERA: I don't have no words for him. If he ain't a lawyer I don't have no words for him.

DET. BOYER: Oh he is, he is an attorney, that's the prosecuting attorney.

ANGEL RIVERA: OK, he's not a judge right?

DET. LANDIS: No, he's our attorney.

ANGEL RIVERA: He's your attorney, he's not mine.

DET. BOYER: Anything else you want to say before we end this interview?

ANGEL RIVERA: No.[18]

In *Berghuis v. Thompkins*, 130 S.Ct. 2250, 2259-2260 (2010), the United States Supreme Court reaffirmed the holding in *Davis v. United States,* 512 U.S. 452, 459 (1994), where it was held that in the context of invoking the *Miranda* right to counsel, a suspect must do so "unambiguously." In other words, "if an accused makes a statement concerning the right to counsel that is ambiguous or equivocal...the police are not required to end the interrogation." *Id.* "Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present

---

18. Transcript of interview, p. 19.

sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards*[19] does not require that the officers stop questioning the suspect." *Davis*, 512 U.S. at 459 (citations and quotations omitted). ("Maybe I should talk to a lawyer" was insufficient to invoke Fifth Amendment right to counsel). See *Commonwealth v. Cleveland*, 2010 WL 4357311 (Pa. Comm. Pl. 2010) (collecting cases) (Defendant's request to speak with a lawyer after getting out of hospital did not unambiguously invoke right to counsel); *United States v. Clark*, 2010 WL 3719617 (D.Me. October 21, 2010) (collecting cases) (Defendant did not unambiguously invoke his *Miranda* right to counsel or to cease questioning by stating during custodial interrogation "I guess this is where I have to stop and ask for a lawyer.").

On the other hand, "a defendant who requests counsel at any time during a custodial interview 'is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conver-sations with the police.'" *Commonwealth v. Edwards*, 588 Pa. 151, 170, 903 A.2d 1139, 1150 (Pa. 2006), quoting *Edwards v. Arizona*, 451 U.S. at 484-85 (1981). Furthermore, when a defendant invokes his right to counsel, a confession secured afterward will be suppressed unless the defendant not only "'[initiated] further communication, exchanges or conversations with the police,' [but also] knowingly

19. 451 U.S. 477(1981).

and intelligently waived the right to counsel." *Id.*, quoting *Commonwealth v. Hubble*, 509 Pa. 497, 510, 504 A.2d 168, 175 (Pa. 1986), cert. denied 477 U.S. 904 (1986).

> If the police do subsequently initiate an encounter in the absence of counsel, the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards. This is 'designed to prevent badgering a defendant into waiving his previously asserted Miranda [right to counsel] rights...'

*Commonwealth v. Hayes*, 755 A.2d 27, 32-33 (Pa. Super. 2000), quoting *Commonwealth v. Wyatt*, 669 A.2d 954, 956-957 (Pa. Super. 1995) and *McNeil v. Wisconsin*, 501 U.S. 171, 174-177(1991).

Here, the defendant's repartee with the detectives was not a request for counsel, but a disinclination to speak with District Attorney Martin. His statement "[h]e's your attorney not mine" is not a request for counsel, but represents the defendant's belief that District Attorney Martin was aligned with the detectives. The defendant's comments are, at best, ambiguous and equivocal. In light of his willingness to speak to the detectives and attempt to convince them that he was not involved in the shooting, there is no evidence these comments represented an invocation of his right to counsel. See *Smith v. Illinois*, 469 U.S. 91, 96 (1984); *Hubble*, 504 A.2d at 174-176 (Pa. 1986); *Commonwealth v. Colon*, 846 A.2d 747, 757-759 (Pa.Super. 2004); *Commonwealth v. Waggoner*, 540

A.2d 280, 287-289 (Pa.Super. 1988); What Constitutes Assertion of Right to Counsel Following *Miranda* Warnings - State Cases, 83 ALR 4th 443 (1991). "To hold that every utterance of the word 'lawyer' automatically erects the *Edwards*' 'cone of silence' around the accused, thus insulating him from *all* further police-initiated questioning and communication, would be far too rigid and would not serve the interests or needs of justice." *Hubble*, 504 A.2d at 175 [emphasis in original].

## C. *Right to Remain Silent*

Detective Boyer concluded the initial questioning of the defendant by asking him if he had anything else to say "before we end this interview."[20] The defendant responds by saying "no," and the interview is stopped at 11:30 p.m. It is the defendant's claim that those comments, coupled with a portion of Detective Landis' report, demonstrate that the defendant exercised his right to remain silent.

In *Berghuis* supra., at 2260, the Supreme Court held "there is no principled reason to adopt different standards for determining when an accused has invoked the Miranda right to remain silent and the *Miranda* right to counsel." *Id.* If an accused wants to invoke his right to remain silent he must do so unambiguously.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the right to remain silent and the obligations placed upon law enforcement were explained as follows:

> *If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain*

---

20. Transcript of interview, p. 19.

*silent, the interrogation must cease.* At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person who invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

*Id.,* 384 U.S. at 473-74, 86 S.Ct. at 1627 (emphasis added).

Then, in *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the court interpreted the above-quoted passage from *Miranda* in order to answer the question of whether, and under what circumstances, police may resume questioning of a suspect who invoked his right to remain silent. In fashioning a rule, the court opined:

Through the exercise of his option to terminate questioning [the suspect] can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. *We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether the "right to cut off questioning" was "scrupulously honored."* (footnote omitted.)

*Id.,* 423 U.S. at 103-104, 96 S.Ct. at 326 (emphasis

556

added).[21]

Here, the interview was ended by Detective Boyer, not by the defendant. Nothing in the transcript even suggests that the defendant was exercising his right to remain silent, either ambiguously or unambiguously. The only pertinent request made by the defendant was an opportunity to speak with his mother. The police honored that request, and the defendant consulted privately with his mother prior to any further questioning. When the questioning was resumed, the defendant acknowledged that he agreed to talk with the detectives if he was given the opportunity to speak with his mother.[22]

It is apparent that even under the defense theory the police "scrupulously" protected the defendant's right to remain silent. The second segment of the interview did not

21. Police were found to have "scrupulously honored" an assertion of the right to remain silent where questioning ceased immediately, was resumed only after a significant period of time, and was preceded by a fresh set of *Miranda* warnings. See *Mosley*, 423 U.S. at 106, 96 S.Ct. at 327 (Police immediately ceased the interrogation and resumed questioning after the passage of two hours and a fresh set of warnings, and, police did not question on the subject matter of the earlier interrogation); *Commonwealth v. Russell*, 938 A.2d 1082, 1091 (Pa.Super. 2007) (Police questioning after invocation of a defendant's right to remain silent is not a per se violation of that right. Police ceased questioning upon the request of the defendant, and only resumed it two hours later after defendant agreed to speak and *Miranda* warnings were provided); *Commonwealth v. Rose*, 265 Pa. Super. 159, 167-68, 401 A.2d 1148, 1153 (1979) (defendant decided to remain silent and no interrogation look place until, approximately two and one-half hours later, police confronted the defendant with additional information, issued fresh *Miranda* warnings, and obtained an inculpatory statement after the defendant waived his rights); *Commonwealth v. Reiland*, 241 Pa. Super. 109, 114, 359 A.2d 811, 814 (1976) (Defendant expressed equivocation about his willingness to talk at time of arrest, police asked no further questions but transported him to police station where he was re-*Mirandized* and then made incriminating statements).

22. Transcript of the interview, p. 20.

take place for over two hours after the initial interview, and with the defendant's mother present. The defendant once again acknowledged his *Miranda* rights and agreed to speak about the shooting. Nothing in the record suggests police coercion or that the defendant made an unambiguous request to remain silent.[23]

For all the foregoing reasons, the motion to suppress the defendant's statements must be denied.

### ORDER

And now, this January 14, 2011, following hearings held in this matter and consideration of memorandum of law submitted by counsel;

It is hereby ordered that the "motion to suppress statements of defendant" is denied.

---

23. It was proper for defense counsel to use the report of Detective Landis in an attempt to impeach him, and suggest that the defendant exercised his right to remain silent. Commonwealth v. Melendez, 474 A.2d 617, 620 (Pa.Super. 1984). Police should use punctilious care in drafting their reports. However, aside from what this Court interprets as poor wording, there is nothing in the defendant's recorded statement that supports the claim that he invoked his right to remain silent.